IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  09-cv-01533-WYD-MJW

THOMAS  M.  ALLEN,

Plaintiff,

v.

DENVER POLICE OFFICER SERGEY GUREVICH, et al.,

Defendants.

---

## RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SANCTIONS (DOCKET NO. 50)

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**


This matter is before the court on Defendants Denver Police Officer Sergey Gurevich and City and County of Denver ("Denver Defendants") Motion for Sanctions (docket no. 50).  The court has reviewed the subject motion (docket no. 50) and Plaintiff's response (docket no. 59).  In addition, the court has taken judicial notice of the court's file and has considered applicable Federal Rules of Civil Procedure and case law.  The court now being fully informed makes the following findings of fact, conclusions of law, and recommendation.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court finds:

1.    That I have jurisdiction over the subject matter and over the parties to this lawsuit;

2.      That venue is proper in the state and District of Colorado;

3.      That each party has been given a fair and adequate opportunity to be heard on the subject motion (docket no. 50);

4.      That Plaintiff's Complaint alleges United States Constitution and Federal law claims under 28 U.S.C. §§ 1331, 1337, 1343(a), and 1367(a); 42 U.S.C. §§ 1983, 1985, 1986, and 1988; and 18 U.S.C. §§ 1961-1968; and injunctive relief under Fed. R. Civ. P. 65;

5.      That Plaintiff's Complaint (docket no. 21) at pages 15 -16 and the Rule 16 Scheduling Order (docket no. 16) at page 11 list the types of damages that Plaintiff is seeking in this lawsuit;

6.      That, in particular, Plaintiff sought compensatory damages for **"the foreclosure of his $319,000 home due to his inability to be employed."** See paragraph 5 a.(e) on page 11 of the Rule 16 Scheduling Order (docket no. 16) (emphasis added);

7.      That Plaintiff's Initial Disclosures Pursuant to Rule 26(a)(1) served on September 24, 2009, included the following reference in support of his damage claim under the heading Documents and Tangible Things- Description by Category:

     1.      **Foreclosure Documentation** - This will likely include payment notices and other documents evidencing the foreclosure of Plaintiff's home based on his inability to work.

(Emphasis in original);

8. That Plaintiff intentionally falsified in his Rule 26 disclosures a document entitled "Official State of Colorado Notice of Opportunity for Foreclosure Deferment Pursuant to Colorado Revised States § 38038-805, C.R.S." ("Deferment Notice") in support of his claim for compensatory damages for **"the foreclosure of his $319,000 home due to his inablility to be employed."** (Emphasis added). Plaintiff intentionally provided to Defendant this falsified Deferment Notice document in his Rule 26 disclosures knowing full well that he was never an owner of the property known as 6700 E. Harvard Ave., Denver, Colorado 80224. See exhibit A attached to the subject motion (docket no. 50). See also the deposition of the sole owner of the property (plaintiff's girlfriend), Tanja L. Jenkins, exhibit C attached to the subject motion (docket no. 50), and the deposition of Plaintiff, exhibit D attached to the subject motion (docket no. 50);

9. That Plaintiff's deposition was taken on January 12, 2010, and such deposition demonstrates clearly that Plaintiff willfully, intentionally, and knowingly endorsed and served the falsified Deferment Notice as evidentiary support for this damage claim seeking $319,000. Plaintiff also admitted during his deposition that he gave the false Deferment Notice (exhibit A) to his attorneys to improve his position

in this case. In addition, plaintiff repeatedly changed his explanation about how the Deferment Notice document was falsified. He stated the following during his deposition:

Q.      . . . did you rent or own [the property on E. Harvard]?

A.      We owned.

Q.      And who's "we"?

A.      My girlfriend and I.

Q.      Tanya Jenkins -

A.      Yes.

Q.      – and you owned that property?

A.      Yes, sir.

Q.      . . .  Were you on the title as far as the deed to that property?

A.      No, sir.

Q.      Whose name was on the deed?

A.      My girlfriend's.

Q.      And were you on the mortgage note for that property?

A.      I wasn't.

Q.      Whose name was on the mortgage.

A.      My girlfriend's.

Q.      And that would be Tanya Jenkins?

A.      Correct.

Q.      Okay.  And so when you say "we" owned it, Tanya Jenkins owned that property, correct?

A.   Well, legally, I guess.  I mean–

Q.   And that's what I'm talking about, legally.

. . .

Q.   Did you have anything in writing that said that you were an
     owner of that house?

A.   No, sir.

. . .

Q.   . . . is this [the Deferment Notice] an exact duplicate of the
     document that was - that you received?

A.   I would not know that.  And looking at it, I want to say it
     probably isn't.

Q.   And what's different about it?

A.   I wouldn't know that unless I saw the original one that she
     received.

Q.   You're saying it probably isn't.  What is it about this
     document that dells you it's not?

A.   Well, I'm noting that the foreclosure department is including
     my name, and it should probably only have Tanya's on
     there, because I'm on none of the other documents.

Q.   Okay.  When you say the foreclosure department included
     your name, where is that?

A.   Borrowers.  Tanya L. Jenkins and Thomas M. Allen.  Dar
     Tanya L. Jenkins and Thomas M. Allen.

Q.    Okay.  And is this a copy of the document that you gave to your attorney in this case?

A.    It is.

. . .

Q.    How did [your name] get on this, Mr. Allen?

A.    I think we were discussing both of us going through this together, and we wanted to have me involved as much as her in the foreclosure proceedings, and that's basically it.

Q.    So you wanted to have yourself involved as much as Ms. Jenkins in the foreclosure proceedings?

A.    Right.

. . .

Q.     . . . did you alter that original document in any way?

A.    I, myself, didn't.

Q.    Who did?

A.    I think Tanya may have.

Q.    And how did she alter it?

A.    I don't know.

Q.    Were you present when she altered it?

A.    No sir.

Q.     . . . Do you agree with me that she altered it by putting the words "and Thomas M. Allen" after her name on the ""Borrowers" line?

A.    I alluded to that earlier, sir.  Yes, sir.

Q.    And did she also type the words "and Thomas M. Allen" after her name on the "Dear" line?

A.     Yes sir.

Q.     And then you gave that to your attorney with your name on it, didn't you?

A.     I gave him the one with my name on it.  Yes, sir.  I did.

Q.     And what was the purpose of that?

A.     I guess to show that I wanted to be–that I was part of this.

Q.     But you're not part of it, are you, Mr. Allen?

A.     Yes.  I am part of it, sir.

Q.     Your name is not on the title, is it?

A.     Okay.  I'm not part of it, then.

Q.     So you and Ms. Allen fabricated evidence?

A.     Ms. Jenkins.

Q.     I'm sorry. - Ms. Jenkins fabricated evidence; is that correct?

A.     I guess.  I don't want to perjure myself.  I did not do that.  I did not ask her to do that, but this is what I did end up giving my attorney, and it was–I don't want to put words in her mouth.

. . .

Q.     . . . You knew your name was on that document when you gave it to your attorney, correct?

A.     Yes, sir.

Q.     . . . Why did you give it to your attorney with your name on it?

A.     I guess to show that we, in fact, were together in this deal, even though it wasn't legally.  But as partners, we had agreed to buy the home and to deal with this mess together.  I wasn't going to leave her hanging in the wind.  She wasn't going to be left alone.  It was just —

Q.    But, Mr. Allen, you gave it to your attorney in the context of this case that we're here for today, correct?

A.    Possibly that could have something to do with it.  I guess I wanted him to – them to–

Q.    Answer the question yes or no.  You gave it to your attorney in the context of the lawsuit that you filed in this case that we're here about today, correct?

A.    Yes.

Q.    And this lawsuit is not the foreclosure proceeding that was occurring in a separate proceedings involving the house, is it?

A.    Correct.  Correct.

Q.    . . .  Ms. Jenkins falsified a document, and you gave that document to your attorney, correct?

A.    Yes, sir.

Q.    And you did that to improve your position in this lawsuit, didn't you?

A.    Not so much in the lawsuit.

Q.    Yes or no?  You did that to improve your position in this lawsuit?

A.    No sir.

Q.    You gave it to your attorney as evidence in this case, correct?

A.    I'm trying to think of how I could word it the right way.

**Q.    Yes or no, Mr. Allen?  You gave this document - let me ask you the question again and make sure you understand it.   You gave Exhibit B, the document with your name on it, to your attorney in this lawsuit to improve your position in this lawsuit, correct?**

**A.      Yes.**

**Q.      And it's a false document, isn't it?**

**A.      It is a false document.**

. . .

**Q.      Okay.  When you gave Exhibit B to your attorney in this case, you knew that your name was on that document, correct?**

**A.      I did.**

**Q.      And you knew that the original document did not have your name on it, correct?**

**A.      I did.**

. . .

Q.      I'm going to hand you Exhibit B.  remember we looked at that earlier?

A.      Yes sir.

Q.      How was that document altered?

A.      It should have had only Tanya Jenkins' name on there, and Thomas Allen on both places was put there.  And I'm not trying to make excuses.  I'm just going to tell you exactly what happened.

**I was asked by my attorney's office-they had nothing to do with this-We need to get some documentation from either your bank or somebody that your house is going into foreclosure.  And it had only had Tanya's name on it.**

**We came up with the idea.  I came home one day and I'm like, All right.  Yeah.  What the hell?  They want something, we'll just send it to them.  And that's basically what happened.**

Q.    You say "we" came up with the idea.

A.    Well, it wasn't - it was done, and then afterwards, I didn't disagree with it.

Q.    You say "we" came up with the idea.  that's what you said.

A.    That's what I said.

**Q.    Who came up with the idea?**

**A.    We both did.**

Q.    So you actually had a discussion - you and Ms. Jenkins had a discussion about how you were going to alter that document?

A.    After she–

Q.    Yes or no?

A.    No.

Q.    Tell me who decided to alter that document.

A.    I said I needed something with my name on it, because Tim needs it down at the office.  The next couple of days, I looked at it.  It had been done.  I was like, Yeah.  Just fax it to him.

Q.    So you told Ms. Jenkins that Tim, your lawyer, Mr. Edstrom–

A.    Needed –

Q.    –needed a document related to the foreclosure that had your name on it?

**A.    No.  He just-he assumed that my name would be on it.  I assumed.  I hadn't told him that Tanya was the only person on the paperwork.  I just told him that I was losing my house.  And for lack of better words, this was a stupid idea.  We just faxed him "and Thomas M. Allen" on it.**

Q.    I'm going to keep asking the question until you give me an
      answer.

A.    I did.

**Q.    Who decided to alter that document?**

**A.    Me.**

Q.    Who actually altered the document?

A.    That would be Ms. Jenkins.

Q.    By what mechanism did Ms. Jenkins alter that document?

A.    I have no idea.  And when I say "me," she-when I said I
      needed something with my name on it to sent to Tim, she
      just ran with it.  And I was like, Wow.  Yeah.  All right.  I'm
      guilty, though.

Q.    You're guilty of what?

A.    Of saying that I needed something with my name on it.

Q.    Not just that; you're guilty of sending it to your lawyer?

A.    And I did also send it to–I had it faxed to Tim. Yes, sir.

**Q.    And you knew it was fake when you had it faxed to him?**

**A.    I knew it was fake.**

**Q.    You knew it was altered?**

**A.    I knew she had altered it.**

**Q.    You knew Ms. Jenkins had altered it–**

**A.    Yes, sir.**

**Q.    –at your request?**

**A.    I'll go with that.**

**Q.    Ms. Jenkins altered it at your request, correct?**

**A.    Yeah.**

Q.    So not only were you less than honest with Ms. Jenkins the night of this incident,  you weren't even honest with your lawyers when you gave them fake and altered documents, true?

A.    Correct.

Q.    Did you know that Mr. Edstrom needed to give your fake and altered documents to us, as the defense lawyers in the case?

A.    I was never made aware of anything –where anything was going.  He just asked me to get something over to his office.

Q.    And you've already testified that you gave that to him to improve your position in this case?

A.    I gave it to him because he asked for it.

Q.    And -

A.    And I did – I – yes.  they had nothing to do with it.  I did this on my own.

**Q.    And you gave it to him to improve your position in the case?**

**A.    Yeah.  I guess you could say that.  Yes sir.**

**Q.    And you knew that Mr. Edstrom was going to use that altered, fraudulent document in this lawsuit?**

**A.    I was hoping not.**

Q.    You were hoping that he would?

A.    I was hoping that he wouldn't.

**Q.    You didn't tell him you were hoping he wouldn't use the fraudulent document you gave him, did you?**

**A.    No sir.**

. . .

Plaintiff's deposition, exhibit D, at pages 65, 66, 67, 73-81, 167-71.

(emphasis added);

10.    That "[a] district court has inherent equitable powers to impose the

sanction of dismissal with prejudice because of abusive litigation

practices during discovery." Garcia v. Berkshire Life Ins. Co. of

Am., 569 F.3d 1174, 1179 (10th Cir. 2009).  "Because of the

harshness of dismissal, however, due process requires that the

violation be predicated upon willfulness, bad faith, or [some] fault of

[plaintiff] rather than inability to comply." Id. (quoting Archibeque v.

Atchison, Topeka & Santa Fe Ry. Co., 70 F.3d 1172, 1174 (10th Cir.

1995));

11.    That the Tenth Circuit has adopted a non-exclusive five-part test for

determing the propriety of dismissal when a plaintiff engages in

abusive litigation practices: (1) the degree of actual prejudice to the

defendant; (2) the amount of interference with the judicial process;

(3) the culpability of the litigant; (4) whether the court warned the

party in advance that dismissal of the action would be a likely

sanction for non-compliance; and (5) the efficacy of lesser

sanctions.  See id., Enhrenhaus v. Reynolds, 965 F.2d 916, 920-21

(10th Cir. 1002);

12.    That Defendants have been forced to defend a lawsuit pervaded by

false evidence.  But for Defendants' due diligence in checking the records of the Clerk and Recorder and discovering that the Deferment Notice document was false as tendered to Defendants by Plaintiff in his Rule 26 disclosures, the Plaintiff would have continued to perpetrate this fraud upon the Defendants, upon his own attorneys, and upon the court;

13. That Defendants have been put to enormous additional effort and expense to ferret out Plaintiff's lies and to double check every piece of information that Plaintiff has provided to Defendants;

14. That Plaintiff's fraud upon the court has interfered egregiously with the court's administration of justice;

15. That Plaintiff's fraud upon the court was done willfully, knowingly, intentionally, after careful contemplation, for self-serving purposes, and with a full understanding of the impropriety involved;

16. That "[t]he submission of falsified evidence substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout litigation.  The prejudiced party is forced either to attempt independent corroboration of each submission, at substantial expense of time and money, or to accept the real possibility that those discovery documents submitted by the opposing party are inaccurate.  Nor is the exclusion of the fabricated evidence always enough to deter discovery misconduct." Garcia, 569 F.3d at 1180;

17.     That on March 3, 2010, Plaintiff filed his Unopposed Motion to Dismiss his $319,000 Foreclosure Damage Claim (docket no. 56). Such motion (docket no. 56) was granted by Chief Judge Daniel on March 8, 2010.  See docket no. 60.  However, this motion (docket no. 56) was not filed until after Plaintiff's fraud upon the court was discovered;

18.     That on March 6, 2010, Plaintiff's counsel filed their motion captioned "Plaintiff's Counsels' Partially Unopposed Motion to Withdraw" (docket no. 57).  **In this motion (docket no. 57), Plaintiff's counsel state, *in pertinent part* : "Plaintiff and his counsel have irreconcilable differences regarding conducting the case and issues related to discovery.  Because of these conflicts, Plaintiff's counsel believes it is in both their and Plaintiff's best interest that they withdraw as attorneys of record in the case."**  See docket no. 57, paragraphs 1 and 2;

19.     That in this case, the exclusion of fabricated evidence is not enough to deter discovery misconduct by Plaintiff.  "Litigants would infer that they have everything to gain, and nothing to lose, if manufacturing evidence merely is excluded while their lawsuit continues."  Pope v. Federal Express Corp., 138 F.R.D. 7675, 683 (W.D. Mo. 1990); and

20.     That the mere fact that Plaintiff did not receive an explicit warning

that dismissal would be a likely sanction for fabricating evidence is not a prerequisite to the imposition of dismissal sanctions.  <u>See</u> <u>Garcia</u>, 569 F.3d at 1180; <u>Archibeque</u>, 70 F.3d at 175 (upholding dismissal even though no warning given).  Moreover, the affirmative submission of false evidence is, at minimum, akin to a **fraud on the court**, which other courts have found may justify the sanction of dismissal.  <u>See</u> Garcia, 569 F.3d at 1181-82; <u>Allen v Chi. Transit Auth.</u>, 317 F.3d 696, 703 (7th Cir. 2003).

### RECOMMENDATION

**WHEREFORE**, based upon these findings of fact and conclusions of law, this court **RECOMMENDS**:

1.  That the Defendants Denver Police Officer Sergey Gurevich and City and County of Denver ("Denver Defendants") Motion for Sanctions (docket no. 50) be **GRANTED**;

2.  That this case be **DISMISSED WITH PREJUDICE as to all claims against all defendants**; and

3.  That judgment enter on the Plaintiff's Complaint in favor of all Defendants and against Plaintiff Thomas M. Allen and that costs be awarded to the Defendants.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District**

Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).

Done this 1st day of April 2010.

BY THE COURT.

<u>s/Michael J. Watanabe</u>
MICHAEL J. WATANABE
U.S. MAGISTRATE JUDGE